UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | Criminal No. 10-31-ART |
| v. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| RANDY TRAVIS CUNNAGIN, | ) | **ORDER** |
| Defendant. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The defendant, Randy Travis Cunnagin, asserts that searches of his vehicle and garage violated his Fourth Amendment rights. Cunnagin seeks to suppress all evidence seized, alleging that the searches began before officers obtained a valid search warrant and without his consent. The evidence, however, demonstrates otherwise; his motion to suppress is denied.

## BACKGROUND

The Court held a suppression hearing and heard testimony from Task Force Officer Richard Dalrymple and Special Agent Jody Hughes. *See* R. 50. On February 19, 2010, law enforcement officers visited Randy Travis Cunnagin's residence to perform a "knock and talk" regarding a theft of firearms. Through several cooperating witnesses, authorities learned that a suspect, Larry Vaughn, was living with Cunnagin when the firearms were stolen and may have taken them to Cunnagin's residence. The residence consists of a home and garage with the whole property enclosed by a chain-link fence. The garage is a separate,

two-story building that stands ten feet away from the home. The top floor is an apartment and the government alleges that the ground floor was a meth lab.

Officer Dalrymple and at least three other officers arrived at the residence in three separate vehicles. As the officers approached the residence, Cunnagin was coming out of his driveway but drove his vehicle back in when the officers arrived. Officer Dalrymple approached Cunnagin first and conducted a pat-down after a brief introduction. He then asked for Cunnagin's consent to search the vehicle. Cunnagin stated that he did not own the vehicle, but that he had permission to use it and consented to the search. In the vehicle, Officer Dalrymple found numerous rounds of ammunition and used syringes.

While this was occurring, the other officers performed a sweep of the area. Agent Hughes approached the garage and noticed various shell casings from spent ammunition rounds on the ground. He observed that several appeared recently discharged. Agent Hughes approached the door to the first floor of the garage and knocked. The door was ajar giving Agent Hughes a partial view of the garage's interior, where he saw items consistent with the manufacture of methamphetamine. No one answered the door and Agent Hughes continued to the second floor by way of a staircase on the side of the garage. On the way to the staircase, Agent Hughes observed more shell casings on the ground. Agent Hughes ascended the staircase and knocked on the door to the second floor apartment. Again, no one answered.

Around this time, Officer Dalrymple completed the vehicle search and was following Cunnagin into the house. According to Cunnagin, Vaughn left a shotgun behind, which Cunnagin and Officer Dalrymple were going inside the home to retrieve. On the way,

Cunnagin noted that the door to the first floor of the garage was open and told Officer Dalrymple that either the officers had kicked the door open or that someone broke in. Officer Dalrymple relayed this statement to Agent Hughes, who was on the second floor of the garage. Officer Dalrymple and Cunnagin continued into the house, but Agents Hughes and Vince Kersey performed a protective sweep of the first floor of the garage. Inside the garage, Agent Hughes observed, in plain view, numerous items consistent with the manufacture of meth including cans of propane fuel, a plastic gas can, a pitcher of coffee filters, and a bag of ammonia nitrate.

Inside the house, Officer Dalrymple and Cunnagin retrieved a twelve-gauge shotgun that Vaughn allegedly left behind. Afterwards, Agent Hughes informed Officer Dalrymple of the contents of the garage. Officer Dalrymple asked Cunnagin if he had access to the garage, and Cunnagin replied that only his landlord had access. Officer Dalrymple then decided to obtain a search warrant rather than ask Cunnagin for consent to search the garage. The affidavit Officer Dalrymple used to obtain a search warrant was based partly Agent Hughes' observations. But it also contained a mistake, listing Cunnagin's address as "43 Jaw Road" when the correct address is "42 Jaw Road." Once Officer Dalrymple obtained a search warrant for the home and garage, the officers executed the search and seized items believed to be used to manufacture meth as well as ammunition, gun cases, rifle magazines, and other gun paraphernalia. Officer Dalrymple later confirmed with Cunnagin's landlord that Cunnagin had control over all property within the chain-link fence, including the garage. Cunnagin now challenges the validity of the search of his vehicle and garage. R. 44.

**DISCUSSION**

Cunnagin asserts that the officers did not obtain his consent to search the vehicle, *id.* at 3, and illegally entered his garage, *id.* at 1. Officers obtained a search warrant to seize items in the garage, but the search warrant affidavit was based on observations from the initial entry. Cunnagin asserts that as a result all evidence seized should be suppressed.

It is a "basic principle of Fourth Amendment law" that warrantless searches and seizures are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). In this case, the officers did not have a search warrant when they searched the vehicle or first entered the garage. Thus, the burden is on the government to justify these searches with some exception to the warrant requirement. *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000).

**I. The Vehicle: Consent**

Officer Dalrymple asserts that Cunnagin consented to the search of the vehicle, which would be an exception to the Fourth Amendment's warrant requirement. *See Schneckloth v. Bustamante*, 412 U.S. 218, 219 (1973). There are two requirements for a valid consent to search. First, consent must come from a person with a privacy interest in the place searched. *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996), *abrogated on other grounds by Muscarello v. United States*, 524 U.S. 125, 138 (1998). Cunnagin told Officer Dalrymple that the vehicle was not his, but a driver who borrows a car from its owner still has a legitimate expectation of privacy in the vehicle. *United States v. Dunson*, 940 F.2d 989, 994-95 (6th Cir. 1991), *abrogated on other grounds by United States v. Ferguson*,

8 F.3d 385 (6th Cir. 1993). Thus, even though Cunnagin did not own the vehicle, he still had a privacy interest and, in turn, the capacity to consent to its search.

Second, consent must be free and voluntary. *Riascos-Suarez*, 73 F.3d at 625. Whether consent is voluntary or the product of duress or coercion is a question of fact determined by the totality of the circumstances. *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (citing *Schneckloth*, 412 U.S. at 227). Cunnagin argues that he was not free to consent because of the number of officers present and the officers' blocking of his exit. It is true that some of the hallmarks of duress or coercion are (1) drawn weapons, (2) raised voices, (3) coercive demands, and (4) a large number of officers in plain sight. *United States v. Drayton*, 536 U.S. 194, 204 (2002).

But none of these factors created coercion here. The officers first approached Cunnagin to perform a "knock and talk," which is a legitimate procedure to achieve consent to search. *See United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). While questioning Cunnagin, the officers did not overwhelm him with a show of force. Only three vehicles and four officers were present. This was a reasonable number in light of the suspicion that stolen firearms may have been at Cunnagin's residence. And, of the four officers present, only Officer Dalrymple approached Cunnagin, and he did not raise his voice or draw his weapon. He identified himself as a police officer and stated the purpose of the investigation, but Dalrymple never made coercive demands. He simply asked Cunnagin if he could search his vehicle. Furthermore, Officer Dalrymple testified that Cunnagin was free to leave when the officers arrived. Cunnagin's vehicle was blocked in, but this was not an intimidation tactic. The road leading to Cunnagin's house only fits one vehicle and officers had to use

5

Cunnagin's driveway or else block the road. Additionally, Cunnagin could not use the vehicle to leave anyway. A check on Cunnagin's ID revealed that he had a suspended license. R. 47 at 3. Cunnagin was free to tell the officers he did not wish to speak to them and simply walk inside his home. But there is no evidence that Cunnagin protested at any time. Rather, Cunnagin's behavior suggests he was cooperating and the circumstances indicate that Cunnagin voluntarily consented to the search.

## II. The Garage: Exigent Circumstances

The officers did not obtain Cunnagin's consent to search his garage and there is no reason to think that consent to the vehicle search or allowing entry into the house granted the officers access to the garage. *See Lucas*, 640 F.3d at 177 (asking whether a typical reasonable person, viewing the exchange between officers and the defendant, would determine that the defendant granted voluntary consent for a complete search of the residence). But rather than rely on consent, the government contends that it had two bases to enter the garage: (1) to perform a protective sweep, and (2) to check if the meth lab Hughes observed posed a present danger. Because the officers had a valid reason to perform a protective sweep, the Court need not reach the government's second justification.

Officers need not obtain a warrant when "exigent circumstances" justify an immediate search. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978). Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant. *United States v. Radka*, 904 F.2d 357, 361 (6th Cir. 1990) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984)). The government has the burden to demonstrate exigent circumstances, *Welsh*, 466 U.S. at 749–50, such as a risk of danger to the police or

others, *Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003) (citing *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)).

*Protective Sweep.* Protective sweeps are permissible when the searching officer has a reasonable belief, based on specific facts and rational inferences, that the area harbors an individual posing a danger to the officer or others. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990). There are two types of protective sweeps: (1) following an arrest, officers can look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched, and (2) a sweep aimed at protecting the officers, which is limited to areas of concern and cannot exceed the time necessary to dispel reasonable suspicion of danger. *United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009). Here, only the second condition applies.

The evidence presented shows that the protective sweep was legitimate. Cunnagin himself stated that either the officers broke open the garage door or someone else broke in. Agent Hughes and Officer Dalrymple both testified that none of the officers opened the door, and Cunnagin did not present any evidence to suggest otherwise. While Cunnagin's comment alone would have provided Agent Hughes with justification to perform a protective sweep—i.e. to make sure no one else was on the premises that would pose a risk to the officers or Cunnagin—there was more. Agent Hughes saw spent shell casings on the ground outside of the garage, including shell casings that appeared recently discharged. This suggested that there could have been someone within the residence who had a weapon and a willingness to use it. *See United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996) (holding that an exigency exists when officers can demonstrate that a suspect has a willingness to use

a weapon). Furthermore, Agent Hughes and the other officers did not spend more time in the garage than was necessary to dispel suspicion of a dangerous third party. They limited their entry into the garage only to check rooms where someone could be hiding. The officers made observations of items in plain view and did not exceed the scope of the protective sweep. *See United States v. Atchley*, 474 F.3d 840, 850 (6th Cir. 2007) (noting that officers exceeded the scope of a protective sweep when they looked inside a refrigerator, ice chest, drawer, and ammunition can because "it would be impossible for an individual to hide within any of those compartments."). Once the protective sweep was complete, they even stopped to obtain a search warrant so that they could conduct a proper search of the garage. These actions confirm that the initial sweep was limited to protect the officers and others. *See Buie*, 494 U.S. at 335 ("We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found."). Considering all of these factors, entry into the garage to perform a protective sweep was valid.

### III. Search Warrant Affidavit

Cunnagin also challenges the validity of the search warrant affidavit because it listed his address as "43 Jaw Road" instead of "42 Jaw Road." But this is simply a scrivener's error that did not affect the existence of probable cause or execution of the search. *See United States v. Frazier*, 423 F.3d 526, 535 (6th Cir. 2005) ("Punishing [the agent] for [a scrivener's error] would have no foreseeable deterrent effect on future police misconduct."); *United States v. Charles*, 138 F.3d 257, 264 (6th Cir. 1998) (holding that errors in the

8

affidavit resulting from poor draftsmanship rather than from a deliberate or reckless disregard for the truth cannot be characterized as erroneous).  At the hearing, Agent Hughes made it clear that officers arrived at Cunnagin's residence, waited there while Officer Dalrymple obtained a search warrant, and searched the same residence when Officer Dalrymple returned.  There is no reason to invalidate the search based on the error in the search warrant affidavit.

## CONCLUSION

The defendant conceded that if the government had a valid reason to enter the car and garage, the search warrant was valid.  For the reason provided above, the government had a valid basis.  Thus, the resulting search was valid.  Accordingly, Cunnagin's motion to suppress, R. 44, is **DENIED**.  The Court must now set a new trial date and will schedule a date in a telephonic conference with the parties.  It is **ORDERED** that a telephone conference is scheduled for **Thursday, September 15, 2011**, at **11:00 a.m.**  A court reporter is needed and will be provided by the Court.  The parties must **DIAL-IN** to this conference call five minutes before the scheduled time by following these steps:

(1)  Call AT&T Teleconferencing at 1-877-873-8017;

(2)  Enter access code 8284218 (followed by "#"); and

(3)  When requested, enter the security code, 1031 (followed by "#").

This the 13th day of September, 2011.



Signed By:
*Amul R. Thapar* AT
United States District Judge